Eastern District of Kentucky
**F I L E D**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

JUN 17 2014

AT LONDON
ROBERT R. CARR
CLERK U.S. DISTRICT COURT

UNITED STATES OF AMERICA

V.                                                INFORMATION NO. 6:14-CR-26-HAI

HEMATOLOGY AND ONCOLOGY CENTER, PLLC, and
NATARAJAN MURUGESAN

\* \* \* \* \*

THE UNITED STATES ATTORNEY CHARGES:

BACKGROUND

At all times relevant to this Information:

1. Defendant **HEMATOLOGY AND ONCOLOGY CENTER, PLLC** was a professional limited liability company registered in the Commonwealth of Kentucky. **HEMATOLOGY AND ONCOLOGY CENTER, PLLC** was in the business of providing medical care to cancer patients, including the administration of prescription oncology drugs in the office to patients insured by Medicare.

2. Defendant **NATARAJAN MURUGESAN** was an employee of **HEMATOLOGY AND ONCOLOGY CENTER, PLLC**. Among other responsibilities, **MURUGESAN** managed the day-to-day business affairs of **HEMATOLOGY AND ONCOLOGY CENTER, PLLC** and ordered drugs for use in the medical practice of **HEMATOLOGY AND ONCOLOGY CENTER, PLLC**.

3.      **HEMATOLOGY AND ONCOLOGY CENTER, PLLC** operated an office in Pulaski County, in the Eastern District of Kentucky, at which its medical staff provided care and treatment for patients with various types of cancer, including chemotherapy treatment.   In preparation for these treatments, **HEMATOLOGY AND ONCOLOGY CENTER, PLLC** purchased large amounts of assorted prescription drugs, including chemotherapy drugs.  **MURUGESAN** ordered these drugs from various suppliers.  These drugs were then prescribed, administered, and dispensed by the medical staff of **HEMATOLOGY AND ONCOLOGY CENTER, PLLC**.  **HEMATOLOGY AND ONCOLOGY CENTER, PLLC** then sought reimbursement for the drugs and the administration of these drugs from Medicare and other health benefits programs.

4.      Quality Specialty Products (hereinafter "QSP") was a business in Winnipeg, Canada, offering for sale to physicians and other health care providers in the United States drugs that had been obtained from foreign sources and that had not been approved by the United States Food and Drug Administration (hereinafter "FDA") for distribution or use in the United States.

### The Food, Drug, and Cosmetic Act

5.      The Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* ("FDCA"), existed to protect the health and safety of the American public by enabling regulation of the manufacture, labeling, and distribution of all drugs shipped or received in interstate commerce.

6.      Each of the following articles, listed by the names under which they were marketed in the United States, was a drug subject to regulation under the FDCA, in that it

was: (a) intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man; (b) intended to affect the structure or any function of the body of man; or (c) a biological product applicable to the prevention, treatment, or cure of a disease or condition of human beings. See 21 U.S.C. § 321(g)(1)(B) and (C); 42 U.S.C. § 262(i).

> Abraxane (paclitaxel)
> Alimta (pemetrexed)
> Aloxi (palonosetron)
> Avastin (bevacizumab)
> Eloxatin (oxaliplatin)
> Faslodex (fulvestrant)
> Gemzar (gemcitabine)
> Herceptin (trastuzumab)
> Hycamtin (topotecan)
> Neulasta (pegfilgrastim)
> Neupogen (filgrastim)
> Reclast (zoledronic acid)
> Taxotere (docetaxel)
> Velcade (bortezomib)
> Zometa (zoledronic acid)

Moreover, each of these drugs was available only by prescription, because either: (a) due to the drug's toxicity and other harmful effects, it was not safe to use except under the supervision of a practitioner licensed by law to administer the drug; or (b) a new drug application approved by the FDA limited the drug to use under the professional supervision of a practitioner licensed by law to administer the drug. See 21 U.S.C. § 353(b)(1). These prescription drugs were used primarily to treat individuals with cancer and were often administered intravenously.

7. The FDCA defined a "new drug" as, with limited exceptions, any drug that was not generally recognized among qualified experts as safe and effective for use under the conditions prescribed, recommended, or suggested in its labeling. See 21 U.S.C.

§ 321(p). Each of the drugs listed above, and versions of those drugs distributed in countries outside of the United States, were "new drugs."

8. The FDCA prohibited the introduction or delivery for introduction, into interstate commerce, of any "new drug" that had not been approved by the FDA for use or distribution in the United States. *See* 21 U.S.C. §§ 355(a), 331(d). To obtain FDA approval of a new drug, a drug manufacturer was required to submit a detailed application, one purpose of which was to assist the FDA in assessing the drug's safety and quality. Among other information, the drug manufacturer was required to report the results of its own tests of the drug's safety and effectiveness, a listing of the drug's ingredients, and a description of the manufacturing processes and facilities used to create and package the drug. *See* 21 U.S.C. § 355(b)(1).

9. Upon receipt of a new drug application, the FDA conducted an extensive review of the drug's safety, effectiveness, purity, and other characteristics. By statute, the FDA was required to refuse approval of a new drug application in several circumstances, including cases where it concluded: (a) the drug was unsafe for the uses proposed in the application; (b) the manufacturer's tests did not contain adequate information to permit an FDA assessment about the safety of a drug; or (c) the manufacturing conditions were inadequate to produce a drug of sufficient quality or purity. *See* 21 U.S.C. § 355(d).

10. The FDCA also prohibited the sale, following receipt in interstate commerce, of any misbranded drug. Misbranded drugs included any drug that was not labeled with directions under which a layman could safely use a drug for the purposes for which it was intended. *See* 21 U.S.C. § 352(f)(1); 21 C.F.R. § 201.5. Labeling was not considered to

be adequate for use unless, among other things, all labeling information required by and under the authority of the FDCA was in the English language, unless the drug was solely distributed in Puerto Rico or a United States territory. *See* 21 C.F.R. § 201.15(c)(1). Furthermore, misbranded drugs included any prescription drug whose label failed to bear, prior to dispensing, the symbol "Rx only." *See* 21 U.S.C. § 353(b)(4)(a).

### Unapproved and Misbranded Drugs at Hematology and Oncology Center, PLLC

11. On a date in or about December 2009, **MURUGESAN** began to order drugs from QSP. In response to these orders, QSP shipped numerous drugs from a location in Canada. These shipments were delivered to **HEMATOLOGY AND ONCOLOGY CENTER, PLLC,** in Pulaski County, in the Eastern District of Kentucky.

12. The drugs that **HEMATOLOGY AND ONCOLOGY CENTER, PLLC** obtained from QSP were new drugs that the FDA had not approved for distribution or use within the United States. These drugs had been manufactured, packaged, and labeled for distribution to various foreign countries, including Turkey, India, and the European Union.

13. Many of the drugs that **HEMATOLOGY AND ONCOLOGY CENTER, PLLC** obtained from QSP bore labeling in foreign languages, including drugs that had to be mixed manually prior to administration to a patient, in accordance with instructions ordinarily provided on the labeling. These and other drugs that **HEMATOLOGY AND ONCOLOGY CENTER, PLLC** obtained from QSP were misbranded within the meaning of the FDCA.

14. **HEMATOLOGY AND ONCOLOGY CENTER, PLLC** obtained unapproved new drugs and misbranded drugs from QSP, including unapproved and

misbranded versions of the drugs listed in Paragraph 6 above, from approximately December 2009 until approximately July 2011. The medical staff of **HEMATOLOGY AND ONCOLOGY CENTER, PLLC** administered these drugs to its patients, and **HEMATOLOGY AND ONCOLOGY CENTER, PLLC** sought reimbursement for these drugs and the administration of these drugs from Medicare and other health benefits programs.

### COUNT 1
### 21 U.S.C. § 331(d)
### 18 U.S.C. § 2

15. Paragraphs 1 through 14 of this Information are re-alleged and incorporated by reference as though fully set forth herein.

16. On or about July 1, 2010, in Pulaski County, in the Eastern District of Kentucky,

### NATARAJAN MURUGESAN

introduced and delivered for introduction into interstate commerce a quantity of a new drug that was a version of the prescription drug marketed in the United States as Avastin, which the FDA had not approved for distribution in the United States, in violation of 21 U.S.C. § 331(d), 21 U.S.C. § 333(a)(1), and 18 U.S.C. § 2.

### COUNT 2
### 21 U.S.C. § 331(c)

17. Paragraphs 1 through 14 of this Information are re-alleged and incorporated by reference as though fully set forth herein.

18. On or about June 9, 2011, in Pulaski County, in the Eastern District of Kentucky,

**HEMATOLOGY AND ONCOLOGY CENTER, PLLC**

received in interstate commerce and delivered for pay and otherwise a quantity of a version of the prescription drug marketed in the United States as Gemzar, which was misbranded in that the drug's labeling failed to bear adequate directions for use, in violation of 21 U.S.C. §§ 331(c), 333(a)(1).

*[signature]*
KERRY B. HARVEY
UNITED STATES ATTORNEY

## **PENALTIES**

**COUNT 1:**   Not more than 1 year imprisonment, $100,000 fine, and 1 year supervised release.

**COUNT 2:**   Not more than five years probation and a $200,000 fine.

**PLUS:**   Mandatory special assessment of $25 for Count 1 and $125 for Count 2.

**PLUS:**   Restitution, if applicable.